***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. All parties are properly before the Industrial Commission and there is no question as to misjoinder or nonjoinder of parties.
3. An employer-employee relationship existed between the parties.
4. Defendant-employer is self insured with Cunningham Lindsey Claims Management, Inc. as the third-party administrator.
5. Plaintiff's average weekly wage is $240.00, yielding a compensation rate of $160.00 per week.
6. Plaintiff sustained a compensable injury by accident or an occupational disease of his right arm by on or about September 1, 2000.
7. The depositions of Anthony J. DeFranzo, M.D., James Dallis, M.D., Stephen D. Carpenter, M.Ed., Tracey H. Weaver, and Robert Garrett Griffin are a part of the record.
8. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1 — Plaintiff's medical records.
b. Stipulated Exhibit #2 — Industrial Commission forms and filings.
c. Stipulated Exhibit #3 — Plaintiff's physical therapy records.
d. Stipulated Exhibit #4 — Plaintiff's answers to defendant's interrogatories and defendant's answers to plaintiff's interrogatories.
9. Test report dated January 24, 2005 from ErgoScience is received into evidence over plaintiff's objection.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 48 years old and received a business administration and retail marketing degree in 1986 from Pitt Community College. Plaintiff has been blind since childhood and is right-hand dominant.
2. From 1974 through 1999, plaintiff worked for various employers and was also self-employed, performing unskilled labor involving the use of both hands.
3. In or about March 2000, plaintiff was employed as a mattress assembler by Winston-Salem Industries for the Blind, Inc. Plaintiff's normal and usual duties consisted of using a staple gun to attach felt covers to each side of mattresses and/or box springs. Plaintiff usually covered 80 to 130 mattresses per workday, depending on the mattress size, and he worked five days a week. Plaintiff stacked mattresses weighing 30 pounds or more onto a pallet, in stacks of 30. Plaintiff frequently lifted box springs over his head and threw the box springs onto the stack.
4. On September 1, 2000, plaintiff lifted a box spring over his head and threw it onto the top of a stack of approximately 30 items when he felt a sharp burning pain in his right shoulder and right arm. Plaintiff immediately reported his right arm injury to his supervisor, Greg Lambert.
5. Plaintiff continued to perform his work duties to the best of his abilities for the next three months, but his right shoulder and arm pain continued to slowly get worse. By late November 2000, plaintiff was barely able to use his right arm. In October and November 2000, defendant assigned plaintiff lighter duties, but plaintiff's right arm continued to get worse.
6. On December 1, 2000, plaintiff sought medical treatment from his family physician, Dr. Shama R. Mittal, to whom plaintiff gave a history of three months of right arm pain following an injury to his right arm while lifting a mattress at work. Dr. Mittal diagnosed a right biceps tendon tear and limited plaintiff to left hand work only. Later that day, plaintiff was evaluated at PrimeCare, which also diagnosed a right biceps tendon tear, limited the use of plaintiff's right arm, and referred plaintiff to an orthopedist.
7. On December 13, 2000, Dr. Thomas Spangler, an orthopedist at Winston Bone Joint Surgical Associates, P.A., evaluated plaintiff's right arm and diagnosed a long head right biceps tendon tear and chronic right shoulder impingement. Plaintiff continued to work at light duty for defendant through January 15, 2001.
8. On January 16, 2001, Dr. Gregory Holthusen, orthopedist, evaluated plaintiff and felt plaintiff's right arm pain was a result of rotator cuff tendonitis and possibly a rotator cuff tear. Dr. Holthusen felt that surgery would not help the torn biceps tendon, but noted that he would be willing to refer plaintiff to another physician for a second opinion.
9. On January 25, 2001, Dr. Holthusen's partner, board-certified orthopedic surgeon Dr. James Dallis, evaluated plaintiff and prescribed physical therapy, in which plaintiff participated during February and March 2001. The physical therapist felt plaintiff suffered from right shoulder impingement.
10. In the period March 20, 2001 through March 25, 2001, plaintiff tried to return to work for defendant, but was unsuccessful due to his right arm pain.
11. On March 26, 2001, plaintiff returned to Dr. Dallis and complained of more shoulder and biceps pain. A right shoulder MRI was performed on April 30, 2001, which revealed that plaintiff suffered from a complete tear of his right rotator cuff, as well as right shoulder impingement syndrome. On May 17, 2001, Dr. Dallis diagnosed plaintiff as also suffering from right tennis elbow or lateral epicondylitis. Dr. Dallis planed to do a subacromial decompression of the rotator cuff tendon as well as a lateral epicondylar release.
12. On June 21, 2001, Dr. Dallis operated on plaintiff's right shoulder and found "a massive rotator cuff tendon defect" or tear, which was greater than five centimeters. Plaintiff's biceps tendon was also ruptured. Dr. Dallis also operated on plaintiff's right elbow to remove chronically inflamed tissue at the extensor carpi radialis brevis, as well as in the lateral epicondylar region. Plaintiff's right arm was placed in a shoulder immobilizer.
13. Beginning at least by June 21, 2001, plaintiff used his left hand to compensate for not being able to use his right hand to perform activities of daily living. Plaintiff was restricted from work following his surgery.
14. On July 11, 2001, defendant admitted that on September 1, 2000, plaintiff sustained a compensable injury by accident, namely, "right shoulder and elbow tendon tears" and effective January 16, 2001 began paying temporary total disability compensation benefits to plaintiff at a compensation rate of $160.00 per week.
15. In the period from August to December 2001, plaintiff participated in another course of physical therapy treatments. Plaintiff was unable to meet the goals of therapy due to right shoulder pain and weakness.
16. In August and November 2001, plaintiff exhibited swelling, skin discoloration and temperature changes in his right arm, which Dr. Dallis characterized as RSD or reflex sympathetic dystrophy symptoms. On November 8, 2001, Dr. Dallis authorized plaintiff to try to return to work at light duty, using only his left-hand. Dr. Dallis also indicated plaintiff might need some vocational rehabilitation training and did not feel plaintiff would ever return to heavy manual work.
17. On November 26, 2001, plaintiff again tried to return to work for defendant at the position of "marker assembler" or "marker assembly," which position defendant maintained was a light duty, one-handed position. The position actually required the use of two hands, and plaintiff was only able to perform duties associated with this position for two hours, after which time he was unable to continue working due to severe right arm pain.
18. On December 5, 2001, Dr. Dallis wrote that in his opinion, and the Full Commission finds as fact, that plaintiff was unable to perform the marker assembler position offered by defendant due to plaintiff's September 1, 2000 right arm injury by accident, as the job was not suitable according to plaintiff's work limitations. Plaintiff therefore did not refuse suitable employment when this position was offered to him again in March 2003, as the marker assembler position was not suitable for plaintiff.
19. On January 2, 2002, Dr. David O'Brien performed a nerve conduction study on plaintiff, which revealed "a severe ulnar neuropathy that appeared to be localized to the [right] wrist." Additional nerve conduction studies in March 2002 by neurologist Dr. Richard Bey revealed plaintiff suffered from "a moderate ulnar neuropathy at the [right] elbow."
20. Dr. Dallis testified that plaintiff suffers from chronic moderate to severe right elbow and shoulder pain. Further elbow surgery would tend to help numbness, but probably would not alleviate plaintiff's elbow or shoulder pain, which remain plaintiff's primary symptoms. Dr. Dallis stated that plaintiff is permanently unable to use his dominant right hand to perform work duties due to right elbow and shoulder pain. On June 27, 2002, Dr. Dallis gave plaintiff a permanent work restriction of light-duty, left-handed work, if available. Plaintiff was then discharged from Dr. Dallis' care with the option to return if he was interested in pursuing an ulnar nerve transposition. As of June 27, 2002, plaintiff reached maximum medical improvement from his September 1, 2000 injuries to his right shoulder and right elbow. Dr. Dallis assigned plaintiff a 15% permanent partial disability rating to the right arm as a result of plaintiff's September 1, 2000 injury by accident.
21. On May 29, 2003, Dr. Anthony J. DeFranzo, plastic and reconstructive surgeon and hand specialist at Wake Forest University Baptist Medical Center, examined plaintiff for numbness and tingling in his left thumb, index and long fingers, as well as some general weakness in his left hand. Dr. DeFranzo assessed plaintiff as suffering from carpal tunnel syndrome and possible cubital tunnel syndrome, noting that they could be related to his prior injury for overcompensation with his left hand. At his deposition, Dr. DeFranzo stated that in his opinion, plaintiff's limited ability to use his dominant right hand in the period after at least June 2001, due to his September 1, 2000 injury by accident, resulted in plaintiff's overuse of his left hand. Dr. DeFranzo stated and the Commission finds that plaintiff's overuse of his left hand was a significant causal factor in his development of symptoms of left carpal tunnel syndrome by late May 2003. Dr. DeFranzo believed that plaintiff would benefit from left carpal tunnel release surgery, which would give plaintiff some improvement in his left hand.
22. Dr. Richard Rauck, pain specialist, is the authorized treating physician for plaintiff's continuing right arm pain.
23. The videotape of plaintiff's activities at his home in March and April 2003 showed that plaintiff used his right hand to perform some activities of daily living, including cleaning glass and sweeping. Plaintiff testified that he uses his right hand to perform activities of daily living for short periods of time and does the best he can. The videotape evidence, while showing plaintiff is able to use his right hand for some activities, does not establish convincing evidence that plaintiff has the capacity to earn wages by using his right hand.
24. Stephen Carpenter, rehabilitation counselor-consultant, stated that in light of plaintiff's age, education, prior work history, blindness, and inability to use his dominant right arm to perform sustained work activities, there are no jobs available in the competitive employment market in North Carolina or in the sheltered workshops located in and around the Forsyth County, North Carolina area where plaintiff lives.
25. Following oral arguments before the Full Commission, the Commission on December 23, 2004 ordered plaintiff to submit to a functional capacity evaluation, as recommended by Dr. Dallis. Lois Maple, physical therapist at ErgoScience, evaluated plaintiff on January 24, 2005. The testing done by Ms. Maple was a physical work performance evaluation summary and appears to be a comparison of plaintiff's abilities and the marker assembly job, which the Commission has found to be not suitable employment. Plaintiff was unable to complete the testing due to numbness in his hands, pain in the left rib cage and nausea. Therefore, Ms. Maple reported that she was unable to determine plaintiff's level of work and was unable to predict whether plaintiff could sustain work for an eight-hour day. Because the testing does not appear to be a valid functional capacity evaluation as ordered by the Commission, the Commission gives no weight to the test results.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On September 1, 2000, plaintiff sustained an admittedly compensable injury by accident or an occupational disease to his right shoulder and his right elbow. N.C. Gen. Stat. §§ 97-2(6) and/or 97-53(13).
2. Since January 16, 2001, plaintiff has been totally disabled due to his compensable right arm injury, except during his unsuccessful trial return to work efforts. Plaintiff is entitled to permanent and total disability compensation benefits beginning January 16, 2001 and continuing for plaintiff's lifetime, subject to a credit for plaintiff's earnings during the unsuccessful trial return to work periods and a credit for disability benefits already paid to plaintiff. N.C. Gen. Stat. §§ 97-29 and 97-32.1.
3. The marker assembly position is not suitable to plaintiff's capacities and plaintiff was justified in refusing defendant's offer to work at defendant-employer in a marker assembler position. N.C. Gen. Stat. § 97-32.
4. Plaintiff is entitled to medical compensation for his compensable right arm injury and for his resulting left carpal tunnel syndrome so long as such treatment reasonably tends to effect a cure, give relief or lessen the period of plaintiff's disability. The approved medical expenses include treatment by Dr. Richard Rauck for pain and by Dr. Anthony DeFranzo for the left carpal tunnel syndrome. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Defendant shall pay plaintiff permanent and total disability compensation benefits beginning January 16, 2001 and continuing for plaintiff's lifetime, subject to a credit for plaintiff's earnings during the unsuccessful trial return to work periods and a credit for disability compensation already paid. Said compensation shall be paid at the rate of $160.00 per week, subject to attorney's fees approved in paragraph 3 of this Award.
2. Defendant shall pay all medical expenses resulting from plaintiff's right shoulder and elbow injury, including treatment for plaintiff's left hand carpal tunnel syndrome by Dr. DeFranzo and treatment for plaintiff's continuing pain by Dr. Rauck.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff is approved for plaintiff's counsel and defendant shall pay directly to plaintiff's counsel every fourth check due plaintiff under Paragraph 1 of this Award.
4. Defendant shall pay the costs.
This the 1st day of June 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER